The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. We're ready to hear argument on our next case, Skibo v. Greer Laboratories. Mr. Bograd. Yes, thank you, Your Honor. May it please the Court, Louis Bograd for Appellants Relators Skibo and Pat. This is a False Claims Act case for defrauding federal health care programs into paying for the cost of unlawful mixes of allergenic extracts. The only issue before the Court on the principal FCA claim is the question of scienter. The District Court erred in finding no genuine dispute as to scienter. Relators offered more than sufficient evidence for a jury to find that Greer knew or recklessly disregarded the fact that its custom mixes violated FDA regulations. What is your best evidence of that? Your Honor, I have considerable evidence of that. I'm about to proceed through four separate categories of evidence on that score. I'll leave it to you to tell me which is the best, but I think it's all fairly substantial. The four categories of evidence the plaintiffs offered below are the following. Greer's explicit efforts to mislead the FDA about the nature of its custom mixes. Greer's efforts to hide its custom mix practices from the FDA. Other evidence of Greer's guilty knowledge. And finally, the clarity of the FDA regulations themselves. On that last point, the clarity of the FDA regulations themselves, it looks like the regulations weren't clear even to the FDA up until 2015 when it provided its guidance. I think that's not true, Your Honor. This regulation obviously dates back to the 40s, and it's been interpreted consistently the entire way. In fact, the fact that Greer consistently misled the FDA about what it was doing suggests it understood precisely that. So Greer and everybody else in the industry consistently misled the FDA since the 1940s? Well, Your Honor, I think the evidence about what other companies in the industry were doing is very conflicting and uncertain. At least Hollister, the largest company in the industry, appears to have only sold custom mixes pursuant to prescriptions, which would be consistent with our understanding of the law. But the FDA said as early as 1997, when it issued its industry guidance prohibiting combination vaccines, that combinations of multiple antigens, biological antigens in a single product required a separate license for the combination product. I don't think there's any indication that the FDA was ever inconsistent in its approach on this score. Indeed, there are references in FDA publications from FDA panels, Federal Register notices from the 70s and 80s, where the FDA expressed strong concern about the danger of combination products and therefore required separate licenses. I know there was a warning by the FDA in, I think, 2014 or 2013 to this company. Were there any warnings before that? There were not, Your Honor. To this company, to the appellee? Not that I'm aware of, Your Honor, and I think that's precisely because until 2013, the FDA was unaware of what the company was doing. Was the FDA inspecting the company before 2013? They were, Your Honor, and the company was misleading them. Let me walk through some of that. Following and also J.A. 2475, Breer required that all custom mixes be identified with the prefix RX. Now, we all know that RX means prescription. Custom mixes were not pursuant to prescription, yet they insisted on including that prefix. They did not include that prefix for their licensed mixes. Suggesting an intent to mislead. Similarly, in the 2001, 2005, and 2007 FDA establishment inspection reports, the inspector states that Greer prepares treatment and custom extracts as part of their prescription service. That's a J.A. 2757, 2799, and 2849. So that's at least three separate occasions in the early 2000s where Greer was apparently telling the FDA inspector that their custom mixes were part of their prescription process, not part of their FDA manufacturing process. Similarly, way back in 1994, Greer provided FDA with a list of the four different product types, that's a quote, that Greer manufactured in room 145, which is the room where they make custom mixes, and stated that the only applicable one of these categories was individual prescription mixtures of allergenic extracts. No separate mention of custom mixes pursuant to positions order was made. That's a 2552, and during that same inspection, Greer's chairman told the inspector that in that room, that that room was primarily, quote, primarily used to fill individual prescription allergenic extracts. And as far back as 1982, and this is document J.A. 1510 to 1512, which is a document that Greer only produced on the eve of the summary judgment motion, Greer submitted a sample label for what it called prescription mixtures of allergenic extracts. And their sample label not only had an RX number, it also indicated prescribed by Dr. Baker in the example that we cite in the brief. So, for the last 40, at least 40 years, Greer has been consistently telling the FDA that all of these custom mixing practices were currently. Mr. Brogan, where do we draw the line between reckless conduct that shows reckless disregard and conduct that shows mere negligence? We draw that line. Well, Your Honor, I think I think that line is easy to draw in this case because we have so much so much evidence of conscious behavior by Greer to hide the fact of what it was doing. I agree there can be difficult cases, but I think it's important to note that as this court held in the Gosselin worldwide case, that sophisticated businesses operating in a regulatory environment are presumed to have knowledge of the statute that applies to their behavior. Here, if there was any question on Greer's part about what we think is a facially absolutely clear regulation, and 610.17 says licensed products may not be combined with other licensed products, except as a license is obtained for the combined product. We don't think that's at all ambiguous, but if there was any ambiguity as a sophisticated company in a regulatory environment, we think it is at least reckless or, to use the alternate language, deliberately ignorant of the rules for the company not to seek clarification from the agency. Instead, the company chose to mislead them. Well, you have a long list of items that you've just gone through that you represent as facts that would be in dispute or facts to which a trier of fact would have to apply a standard. I understood part of your argument to be that the district court applied an inaccurate standard under the statute. Is that part of your argument? Your Honor, we have made that argument. I'm not choosing to emphasize it today. There is clearly language in the district court's opinion that we cite in our brief that seems to require fraudulent intent and that seems to require direct evidence of scienter, even though the case law of this court is very clear that fraudulent intent is not required and circumstantial evidence is sufficient to prove scienter. But there's also obviously other language in the opinion that references recklessness and deliberate disregard. So I'm not – we think under the correct standard, there's no question that the district court erred, given the information available. As I said, I just mentioned the specific evidence of efforts to hide – I mean to mislead the FDA. There's also evidence of efforts to hide custom mixes from the FDA. Well, so is the bottom line of your argument not that the district court applied an inappropriate standard but that there were facts in dispute that barred summary judgment? Yes, Judge Agee. That is certainly the bottom line of our position. We think the district court's statements regarding the legal standard may give rise to some question whether it was applying the correct standard. But under either standard, we think there is far more than sufficient evidence in the record for this question to go to the jury. Without commenting on your FCA claim, I noticed you spent about 12 minutes on the FCA claim. Do you really have a retaliation claim here? Your Honor, we do. I think it is the subsidiary claim. The district court obviously rejected it, at least in part, because it didn't find an FCA violation here in the first place. I think there's so much information I want to get out today on the main FCA claim that I'm keeping my focus there. But I think that Ms. Schiebo's own testimony about having told the head of Greer about the problems with custom mixes, coupled with the evidence from the North Carolina Board of Pharmacy Inspection that was triggered by her comments where a Greer employee said, yes, we expected that that employee was going to go complain about custom mixes, so we were sort of expecting this inspection. We think that in and of itself provides a sufficient factual basis to suggest that she had communicated her concerns about potential custom mix fraud to the company shortly before she was terminated. Your complaint seems to have focused almost exclusively in the retaliation context on something called a slit trial, which doesn't appear to be before us. With regard to the custom mix, that sort of seemed to be an afterthought, but I wasn't finding in the record evidence with respect to fraud related to that in terms of the retaliation, as opposed to the argument that there was a regulatory violation. Case law seems to say that a complaint about the regulatory violation is not a basis for a false claims act retaliation claim. Your Honor, I think I think there's some question about the facts there. I think clearly Ms. Schiebo's testimony is that she was advising Mr. Roby that they were selling this stuff illegally, that Roby was aware of that fact when he said, we're not going to put ourselves at a competitive disadvantage by not doing this. Obviously, whether that crosses the threshold to suggest fraudulent conduct, given that everyone in the industry understood that they were making products that were being billed to health care providers, including Medicare and Medicaid and other government programs, we think is sufficient. I'd like to keep the focus for the moment back on the evidence of the underlying substantive false claims act violation, because there's also additional evidence in the form of the fact that Greer excluded custom mixes from its product list that it sent to the FDA. It excluded custom mixes from the PowerPoint presentation it made in 2011 when the FDA inspector came to inspect the company. It excluded and in fact specifically deleted reference to custom mixes from a MedWatch report it knew would be provided to the government. And as we mentioned in the briefs, it also was not retaining retention vials of its custom mixes, which is clear evidence that the company understood that they were not licensed products and were instead trying to pass them off as prescriptions. Because as the company told the FDA itself, they tried to justify this practice by citing to the exception in 21 CFR 600.13, demonstrating that it says that allergenic products prepared to a physician's prescription do not require. Thank you, Mr. Bograd. You've got some time left on rebuttal. I appreciate it. Mr. Gass. Good morning, Your Honors. May it please the court. Again, Mike Gass, representing the defendant of Hallie Greer Laboratories. I will, if it pleases the court, I'll be happy to address the categories that Mr. Bograd identified as showing a material issue with respect to whether or not Greer had Sienter with respect to the requirement that was never adopted until 2015 that it have a separate license for its custom mixes. Just in context, Your Honor, again, Judge Bell, after an exhaustive hearing and giving the relators every opportunity to identify any material fact that presented a probative issue, found that they failed to do so under the standard identified by the Supreme Court in Ritchie, in which the court held that they have the burden to show that the record as a whole supports a finding by a rational trier of fact, and that simply colorable or not significantly probative evidence does not carry that burden. I'm going to start with Mr. Bograd's fourth category, because that is the genesis of this entire issue, which is the 1947 regulation, which discussed the fact that you cannot combine separate products without obtaining a separate license. The reason that the entire industry and the FDA for 66 years did not read that as prohibiting custom mixes is because the licensing of the allergenic industry was unique, and that is there was only one license issued to Greer covering hundreds of its products in 1968. And that continues to be the case. Some things have changed with respect to certain products that the FDA regulates in terms of the strength, but they all fall under the same license. And so it was the understanding of everybody for 66 years that this was not a requirement of the regulation, and I would like to refer the court to the record where there was very powerful evidence from people in the know regarding that. Specifically, Dr. Robert Esch, who is an industry expert who worked for Greer going back to the 70s, and whose job it was to interact not only with all of the industry participants, but with the FDA, stated that it never was viewed by anybody as being a requirement here, and in fact, the issue never came up. And he says in his affidavit, had the issue come up, yes, Judge Thacker? Mr. Bograd gave, as an example, Hollister, and says that Hollister only sold this pursuant to prescriptions, so that Hollister must have, I think the implication there is that Hollister must have understood what the requirement was. What's your response to that? The record does not support either the fact or that inference, Your Honor. In fact, the entire industry, once the FDA came out with its guidance, submitted a letter, two letters, saying that the entire industry had been doing this literally since the beginning of time. And the lower court found that that was evidence which strongly supported the fact that this was viewed broadly. It was not just Greer, it was everybody. And significantly, not just the industry, who obviously has a vested interest in here, but the industry representative for the allergist society, as well as from an individual doctor who wrote in on behalf of Kaiser Permanente, said the entire industry has been doing this for 100 years. And the reason that the allergist had asked them to do this is because it is safer and more effective to have the manufacturers combine these ingredients, which they require for a whole bunch of their patients, in the manufacturer's clean room, and not send eight or ten different vials to the allergist where they have to combine them in their bathroom. That was the understanding. I would also point out that our expert, Mr. Cohen, who worked for the FDA for 17 years, saying under this record, it was perfectly reasonable for Greer, along with the rest of the industry, to believe that separate licensure wasn't required. And most significantly, Dr. Schiff, their expert, who they hired to testify that this wasn't okay, ultimately acknowledged that when the issue finally arose in 2013, the FDA was, quote, equivocal, no doubt about it, about whether and how this regulation applied to custom mixes. I would also point out that the need to issue guidance by the FDA, and the fact that it took them so long to do it, was an indication that this was just something that everybody understood was okay until the issue came up in 2013. And as we cited, there's not only regulatory, but case law support for the proposition that you don't issue guidance unless there is confusion about what the regulation actually provides. And Judge Bell looked at all those. I just lost the link. Hello? I think the audio is still on. I lost my video. Well, we can see you and hear you. Well, we can't now. Can you hear me now as the commercial goes? Yes, sir. Go right ahead. Okay. I'll keep talking then. And so when the issue first arose in 2013, the FDA was equivocal, took a long time, and issued guidance, which it's only supposed to issue if there is confusion. So the FDA regulation was not clear. Everybody in the industry understood it, to not require separate licensure, including the FDA, and it didn't arise until 66 years later that it was an issue. So I would like to now turn to Mr. Bogrod's other categories where he alleges that Greer's conduct involved misleading the FDA and hiding from the FDA the fact that custom mixes were not licensed. Your Honors, with all respect, the record, as Judge Bell found it, could not be clearer. And the evidence was overwhelming that, in fact, Greer, along with everybody else, was open about this, did not try to hide anything. And the starting point for that is it listed custom mixes on its website separate from its prescription services as different ways to get combinations of allergens, allergic compounds. The FDA inspected on-site at least 57 times Greer's facilities, and each time it asked for its catalog and its website. The catalog was published on the website, which clearly, as we show in our brief and is in the record, show them as completely different things. One point that I'd like your Honors to keep in mind as you're doing this, as you're reviewing the record, the FDA was and is Greer's licensing agency. That is, nobody knows better than anyone what licenses Greer does have and doesn't have. So on the 57 occasions when it was given the catalog, which is openly and publicly shown on its webcast, it was in possession of the knowledge of what was listed and what wasn't. So the notion that we were hiding this from the FDA, again, I respectfully submit, is not supported anywhere in the record. Beyond that, we identify in our briefs 10 different occasions where Greer, in its communications with the FDA, described its custom mixes as being separate from prescriptions. Beyond that, we identified five different letters. Mr. Das, this is Judge Agee. I have a question for you. What's the impact, this comes at a later time, the FDA does issue a form of some type, I forget the number, to Greer, and then they send them a warning letter. What's the impact of those events on the summary judgment standard here? They don't impact the standard at all. Well, the standard, when you're applying the standard to the evidence that the opposing counsel has set out, what's the impact of those communications from the FDA? They do not demonstrate scienter on the part of Greer, because the record is uncontradicted that when they first raised the issue, when the FDA first raised the issue, Greer went to them multiple times and said, what do we do? Should we stop making this? And the FDA said, we can't tell you. We haven't decided yet. And the relator's own expert, Dr. Schiff, said that it was reasonable for Greer to keep manufacturing until the FDA came down with a final position, because, as he said again, quote, they were being equivocal about it, close quote. So by definition, if they were being reasonable, as their own expert concedes, they were not being reckless or deliberately ignorant of the facts. As soon as the FDA came out with its guidance in February of 2015, Greer stopped. I don't have the clock on my screen. You've got almost eight minutes. Oh, okay. So I would like to now address some of the other things that Mr. Bogart raised, which he said suggests that Greer was misleading or the FDA or hiding the fact. I'll let you know when you get to five minutes and two minutes. Thank you, Your Honor. I appreciate it. Otherwise, I could get long-winded. He points to the fact that they used the nomenclature RX to designate custom mixes as somehow showing an intent to deceive. First of all, against the backdrop of all the evidence where Greer was open and transparent and communicated directly with the FDA regarding its custom mix practices and put them on its website, that evidence, I don't think, shows anything. And, again, according to the Ritchie case, it has to be the evidence taken as a whole. The nomenclature RX was used internally, and the record is undisputed about this, to designate that this was by a physician order. So a physician could do one of two things to get a mix. It could give a prescription for a specific patient, John Smith, or the allergy clinic of Memphis could say, we've got 40 patients that are all allergic to these six different trees, so we would like a tree mix of the allergens relating to those six trees. And those would come in, and they would get those in a bulk. Both were referred to as RX simply because they were coming from a doctor's order, one for a specific patient, one for the entire practice because they have a whole bunch of patients with the same allergies to multiple allergens. We produced in our brief, and it's in the appendix, the actual labels for custom mixes, which on their face show that they are for a practice, not a patient. We would not be doing a very good job of hiding this from the FDA, who has full access to the labels as well as all of our other internal documentation. If you can see by looking at it that a prescription is for a patient, and a custom mix is in a much larger bulk, too much to be used by any patient, and it has on the name of the label itself the name of the practice and not a specific patient. It was not an attempt to hide. It was an internal designation that Greer used that was not intended to fool anybody. You're at five minutes now. Thank you, Your Honor. In terms of the other references that Mr. Bograd used, I'll take, for example, the 1997 guidance regarding combination vaccines that he talks to, and they relied on this heavily at their motion on the summary judgment hearing. That guidance does not relate to allergenic extracts. What they have tried to do is they, because the word antigen appears in that guidance, they try to make the logical connection to say, well, this was obviously about mixing allergies. It was not. In the guidance itself, it defines what it is intended to apply to, which is combination vaccines. And, again, that's in the preamble to the guidance. On the website for the FDA, they list the vaccine subsection, which identifies combination vaccines. None of those are allergenic extracts. Allergenic extracts are a completely different subset of what is encompassed under the broader jurisdiction of that section of the FDA. So on the face of it, that guidance itself does not apply to mixtures of allergens. I guess one other document I'd like to call your attention to, and I'm referring in the case law to the Owens case, which this court decided in 2010. The theories in this case have migrated significantly from the beginning. They started off by alleging that everybody in this industry did this, which turned out to be an accurate allegation. And yet when it became inconvenient to their theory, they tried to argue that, in fact, only Greer did this, an about-face which Judge Bell caused to question the candor, their candor with the court. Similarly, as Judge Ajeeb pointed out, they did not allege at all that the retaliation was based upon custom mixes, but upon some other issues which do not clearly on their face constitute protective activity. This court in Owen stated as follows. The relator's claims have been in a state of metamorphosis. The impression of a suit in search of a wrong is borne out by the failure of the respondent to produce any evidence of deceit.  Two-minute warning. Okay. After getting more than 20,000 documents from Greer, deposing 19 witnesses, they have come up with not a shred of evidence to suggest deceit or any sort of fraud or recklessness or intentional ignorance, which is what's required under the standard. And having failed to find that, they have tried to claw in other issues or other pieces of evidence which do not on their face show either intent or recklessness or conscious disregard by Greer of these issues. Like the court in Owen, this court should see this for what it is, a litigation in search of a wrong, which after significant discovery, they have failed to find and and affirm Judge Bell's holding. Thank you, Your Honors. All right. Thank you, Mr. Gas. Mr. Bograd, you've got some time left and rebuttal. Thank you, Your Honor. I'll attempt to be brief. I'd first like to respond or follow up on a point that I believe it was Judge Agee made regarding the issue of Sienter after the form 483 was issued in 19 in 2013. We think, as I gather Judge Agee does, that at that point it became absolutely clear if there had been any question previously that the FDA considered the sale of these custom mixes without license or prescription to be illegal. So that during the period from 2013 forward, they there was clear Sienter on the part of Greer in continuing to sell these products. The warning, the subsequent warning letter itself specifically says, please note that the sale of these custom mixes violates 21 CFR 6, 10, 17 and should not continue without approval of each custom mixture manufactured under a biologics license. That's a J 3003. And that continued sales could result in license suspension or revocation. So certainly Sienter during that period could be clear cut. I'd also like to respond to the point that Mr. Gass was making about plaintiff's expert Dr. Schiff. It is true that they got him at one point to use the word equivocal, but I don't think that's a fair characterization of his testimony. When he was asked what he thought the company should have done in this period, he said, what I would recommend is to have their doctors write prescriptions at the very least do that. So the and that's a J 2208 to 2209. I think Mr. Gass also mischaracterized the issue of the industry practice letters at the very end of the joint appendix. I believe this is pages 3661 to 3672. There's a set of a series of email correspondence among the members of the APMA when they were getting when they were drafting the April 2014 letter to the FDA. Greer wanted a letter to specifically identify custom mixes as mixes that were non patient prescriptions. Other members of the APMA existed that characterization precisely because they were not submitting using custom mixes without patient prescriptions. And the ultimate letter that was sent to the FDA ducked that issue and remained extremely vague. Hollister's website specifically refers to custom patient prescriptions. That's a J 874 and the July APMA letter mentions three separate kinds of custom mixing, custom mixing per patient prescription, custom mixing in the doctor's office and custom mixing for office use. Only the third one is the one that's at issue in this case and was the only one that we are content. Plaintiffs contend was contrary to law and Greer's behavior. Mr. Gass would have you believe that Greer was open and notorious about what it was doing with the FDA for decades. If that's the case, it seems surprising that the best evidence they can find is a handful of snippets from letters written in the 80s and 90s in which there are passing references made to custom mixing and prescription mixing without any explanation of the distinction between the two. The fact is that for many, many years, Greer was engaged in this improper practice that was on its face inconsistent with clear FDA rulemaking regulatory requirements. They made considerable efforts to hide it from the FDA and as soon as the FDA learned about it, it told them to stop immediately. This court said, as I think I quoted this earlier, in U.S. ex-rel bunk versus government logistics, the issue of fraudulent intention is generally not amenable to resolution in summary judgment. I don't dispute that there are documents that can be read either way, but the fact is that there was considerable evidence of unlawful intent here. The question of Santa properly belongs to the jury and the district court's grant of summary judgment should be reversed. Thank you. Thank you. Thank you, Mr. Bograd. I appreciate, on behalf of the panel, the argument of both counsel and we're going to take a brief recess before going on to our next case. Thank you. This honorable court will take a brief recess.
judges: G. Steven Agee, Henry F. Floyd, Stephanie D. Thacker